T.C. Memo. 2003-118


UNITED STATES TAX COURT


ACME STEEL COMPANY (formerly known as Interlake, Inc.,
and now known as Acme Metals, Inc.) AND CONSOLIDATED
SUBSIDIARIES, Petitioners v. COMMISSIONER OF
INTERNAL REVENUE, Respondent


Docket No. 7885-94.                Filed April 28, 2003.


     P was the common parent of an affiliated group
that was restructured in 1986.  In 1986, pursuant to
the restructuring plan, P formed a subsidiary, I.
Following the formation of I, P became a subsidiary of
I through an inversion.  I then distributed, pro rata
to its shareholders in a spinoff, all the issued and
outstanding common shares of P, which continued to hold
all the shares of one pre-existing subsidiary of P.

     Following the restructuring and spinoff, P filed a
consolidated Form 1120, U.S. Corporation Income Tax
Return, for a 27-week 1986 tax year claiming a
consolidated net operating loss (CNOL).  P filed a Form
1139, Application for Tentative Refund under sec. 6411,
I.R.C., carrying back the CNOL to the affiliated
group's 1981 and 1984 tax years and requesting
tentative refunds for 1981 and 1984.  I filed a
consolidated U.S. corporation income tax return for a
52-week 1986 tax year claiming a CNOL.  I also filed an

application for tentative refund for 1984. The Internal Revenue Service paid P and I the respective tentative refunds for which they had applied.

Following an examination, R determined that P, rather than I, was the continuing common parent of the prespinoff affiliated group, revised P's income on the basis of a 52-week taxable year, and determined that P did not sustain the CNOL claimed on its 1986 return. R also revised I's income on the basis of a 27-week short 1986 tax year. As a result of the foregoing determinations, R determined that P was not entitled to the tentative refunds paid to P for 1981 and 1984 and issued a notice of deficiency to P to recover the tentative refunds.

After P filed the petition in the case at hand, R agreed to treat I as the successor common parent of the prespinoff affiliated group and issued a duplicate notice of deficiency to I, in exchange for P entering into a stipulation of settled issues. The stipulation of settled issues provides, in pertinent part, that P will be liable to disgorge the tentative refunds it was paid for 1981 and 1984 if those tentative refunds are held not to be rebates as to I. In Interlake Corp. v. Commissioner, 112 T.C. 103 (1999), the Court held the tentative refunds paid to P were not rebates as to I.

P now contends the Court does not have jurisdiction to enter decision on the stipulation of settled issues because the tentative refunds P received are nonrebate refunds not taken into account in determining a taxpayer's deficiency. According to P, the tentative refunds are nonrebate refunds because P, as the former common parent of the prespinoff group as conceded by R, was not an "authorized recipient" of the tentative refunds. P contends that when R paid the tentative refunds to P, rather than I, R paid the wrong taxpayer, giving rise to nonrebate refunds.

R contends that the tentative refunds are rebate refunds over which the Court has jurisdiction and that the Court may enter decision on the stipulation of settled issues. According to R, nonrebate refunds are issued because of clerical or computer errors and P has not identified any clerical or computer error that caused R to pay the tentative refunds to P. According

to R, the tentative refunds were paid, after a limited examination pursuant to sec. 6411(b), I.R.C., to the correct taxpayer (P) because they were paid to P, the taxpayer who applied for the tentative carryback adjustments on the basis of the CNOL that P claimed it had incurred.

Held: The tentative refunds in issue are rebate refunds as to P giving rise to deficiencies over which the Court has jurisdiction. Sec. 6411(b), I.R.C. requires R to make only a "limited examination" of an application for tentative carryback adjustment and pay the tentative refund within 90 days. When R paid the tentative refunds to P, R had not finally determined which affiliated group was the continuation of the prespinoff affiliated group, and R was not required to make that determination prior to paying the tentative refunds. The tentative refunds were not paid because of any clerical or computer error requiring nonrebate characterization. The tentative refunds paid to P are recoverable through the deficiency procedures. Accordingly, the Court has jurisdiction to enter decision on the stipulation of settled issues and will do so.

David J. Duez, Matthew P. Larvick, and Gregory G. Palmer, for petitioners.

Lawrence G. Letkewicz and Dana E. Hundrieser, for respondent.

CONTENTS

Background . . . . . . . . . . . . . . . . . . . . . . . 4

The Restructuring and Spinoff . . . . . . . . . . . . . 5
Tax Indemnification Agreement Between Petitioner and
    Interlake . . . . . . . . . . . . . . . . . . . . . . 6
Tax Filings by Interlake and Petitioner . . . . . . . . 10
Administrative Proceedings. . . . . . . . . . . . . . . 12
Notice of Deficiency and Stipulation of Settled
    Issues. . . . . . . . . . . . . . . . . . . . . . . . 14

Interlake v. Commissioner . . . . . . . . . . . . . . . 18
Summary Assessment of the 1985 Tentative Refund . . . . 20
The Bankruptcy Proceedings . . . . . . . . . . . . . . . 21
Change of Petitioner's Representatives in This
  Proceeding . . . . . . . . . . . . . . . . . . . . . 24
Positions of the Parties . . . . . . . . . . . . . . . 25

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rebate and Nonrebate Refunds . . . . . . . . . . . . . 27
Jurisdiction . . . . . . . . . . . . . . . . . . . . . 30
The Notice of Deficiency . . . . . . . . . . . . . . . 31
Respondent's Determination . . . . . . . . . . . . . . 32
Collateral Estoppel. . . . . . . . . . . . . . . . . . 39
The "Injustice Exception" to Collateral Estoppel . . . 47
Tentative Refunds as Rebate Refunds. . . . . . . . . . 50
Rebate v. Nonrebate Refunds. . . . . . . . . . . . . . 61

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . 66

MEMORANDUM OPINION

BEGHE, Judge: This case is before the Court on respondent's motion for entry of decision on the parties' stipulation of settled issues. We shall grant respondent's motion and enter decision in accordance with the stipulation.

Background

Some of the facts have been stipulated and are incorporated by this reference. Petitioner's principal place of business was in Riverdale, Illinois, when it filed the petition. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The Restructuring and Spinoff

Prior to summer 1986, petitioner had been the common parent of an affiliated group of corporations (the affiliated group) on whose behalf it filed consolidated Forms 1120, U.S. Corporation Income Tax Return. In spring 1985, petitioner's management developed a plan to restructure the ownership of its businesses through an inversion and spinoff.

Under the plan, petitioner would organize a wholly owned subsidiary, the Interlake Corporation (Interlake); Interlake would then organize a wholly owned subsidiary (Newco Sub 1), followed by Newco Sub 1's organization of its own wholly owned subsidiary (Newco Sub 2). Following the organizations of these new corporations, petitioner would transfer its assets to Interlake and merge with Newco Sub 2, with petitioner surviving as a wholly owned subsidiary of Newco Sub 1. In connection with the merger of Newco Sub 2 into petitioner, each outstanding share of petitioner's common stock would be converted into a share of common stock of Interlake, and the shares of Interlake that petitioner owned prior to the merger would be canceled.

Petitioner would next organize the Interlake Companies as a wholly owned subsidiary and transfer to it all the shares of the subsidiaries that were then owned by petitioner, with the exception of Alabama Metallurgical Corporation (AMC), which remained a subsidiary of petitioner, in exchange for shares of

the Interlake Companies and assumption by the Interlake Companies of certain liabilities of petitioner. Petitioner would then distribute all the shares of the Interlake Companies to Newco Sub 1. Newco Sub 1 would distribute all its assets, including the shares of the Interlake Companies and petitioner, to Interlake and then dissolve.

On May 29, 1986, the restructuring plan was carried out, and the directors of Interlake met for the first time. At the meeting, the Interlake directors approved the spinoff by which Interlake would distribute all of petitioner's shares pro rata to Interlake's shareholders. The directors also changed the name of petitioner from Interlake, Inc., to Acme. On June 23, 1986, pursuant to the plan, Interlake carried out the spinoff by distributing, pro rata to its shareholders, all the issued and outstanding shares of petitioner.

Tax Indemnification Agreement Between Petitioner and Interlake

On May 30, 1986, petitioner and Interlake entered into a tax indemnification agreement to memorialize their understanding regarding certain Federal income tax matters for the years ending on or before the effective date of the agreement. The agreement defines the effective date as the date on which all outstanding shares of petitioner's common stock are distributed by Interlake to its shareholders. Petitioner and Interlake were represented

by the same law firm during the negotiation and signing of the tax indemnification agreement.

The agreement begins by setting forth the premise that prior to the restructuring, petitioner was the common parent of the affiliated group of which Interlake and its subsidiaries were members. The agreement states that, after the restructuring, Interlake succeeded petitioner as the common parent of the affiliated group of which Interlake, petitioner, and their subsidiaries were members.

Paragraph 4 of the agreement, entitled "Responsibility for Federal Corporate Income Tax Examination and Proceedings Relating Thereto", grants Interlake sole responsibility and authority to handle all Federal income tax matters for all tax years or periods of petitioner or of any subsidiary of petitioner ending on or before the restructuring. Paragraph 4 identifies Interlake as the common parent of the affiliated group under section 1.1502-77, Income Tax Regs.

Paragraph 5 of the agreement, entitled "Responsibility for Federal Corporate Income Taxes Attributable to Taxable Years or Periods Ending After the Effective Date", provides that Interlake shall be solely responsible for all corporate income taxes with respect to the businesses carried on by Interlake and its subsidiaries and, subject to paragraph 6(b), be entitled to all refunds attributable thereto. Paragraph 5 goes on to provide

that petitioner shall be responsible for all corporate income taxes due with respect to the businesses carried on by petitioner and its subsidiaries and, subject to paragraph 6(c), be entitled to all refunds attributable thereto.

Paragraph 6 of the agreement, entitled "Refunds of Federal Corporate Income Tax Resulting from Carrybacks of Net Operating Losses and Other Items", provides under subparagraph (a) that if for any period ending after the effective date, petitioner realizes a net operating loss or credits that may be carried back to taxable years ending before December 31, 1986, Interlake, to the extent it receives any refund from the Internal Revenue Service (IRS), shall within 10 days of receiving the refund pay petitioner the amount of the refund, plus interest.  All matters relating to the filing of a claim for refund shall be determined and handled solely by petitioner, provided that petitioner furnishes Interlake a copy of any claim for refund within 14 days of filing the claim.

Subparagraph 6(b) provides that if the IRS (A) disallows any portion of the net operating loss or excess credits carried back to a taxable year ending prior to December 31, 1986, or (B) proposes to adjust the Federal corporate income tax liability of petitioner, or of any member of the affiliated group of which petitioner previously was the common parent, and seeks to recover from Interlake all or any portion of the Federal corporate income

tax refunded, petitioner shall pay Interlake the lesser of (i) the amount of Federal corporate income taxes at issue, or (ii) the amount Interlake paid to petitioner pursuant to subparagraph 6(a). All matters relating to acceptance or challenge of any disallowance or adjustment to the Federal corporate income tax liability of the carryback year or period shall be handled by petitioner, in its sole discretion and at petitioner's sole cost. If the IRS proposes to adjust the Federal corporate income tax liability of the year to which the loss or credit is carried back, and if the period of limitations for assessment is open, then Interlake shall be solely responsible for handling all matters relating to the IRS's adjustments or proposed adjustments.

Subparagraph 6(c) provides that if Interlake realizes a consolidated net operating loss or credit carryback for any taxable year of Interlake ending after the effective date that Interlake is unable to carry back to 1 or more taxable years ending on or before the effective date, as a result of petitioner's having filed one or more claims for refund, and Interlake's having received and paid petitioner all or a portion of the refund, then petitioner shall repay Interlake a portion of the amount that Interlake paid petitioner on account of the claim or claims for refund.

Under paragraph 11 of the agreement, petitioner agrees that if the IRS should determine that petitioner was the continuing common parent, it would grant Interlake an unqualified power of attorney to represent petitioner in connection with all matters involving Federal income tax for the years ending before the effective date.

Tax Filings by Interlake and Petitioner

On August 7, 1987, Interlake filed Form 1120, Consolidated U.S. Corporation Income Tax Return, for a 52/53-week 1986 tax year ended December 28, 1986. Interlake's 1986 return reported a $8,461,369 consolidated net operating loss (CNOL) and $1,496,693 of excess consolidated general business credits.

On August 11, 1987, Interlake filed Form 1139, Corporation Application for Tentative Refund, with respect to the 1986 tax year. The application requested a tentative carryback adjustment of $5,346,097, attributable to the carryback of the 1986 CNOL and excess consolidated business credits to the group's 1984 tax year. On September 14, 1987, not much more than 1 month later, respondent paid a $5,346,097 tentative refund to Interlake.

On August 28, 1987, petitioner and its wholly owned subsidiary, AMC, filed a consolidated U.S. Corporation Income Tax Return for a 27-week 1986 short tax year, which commenced with the date of the spinoff, June 23, 1986, and ended December 28, 1986. Petitioner's 1986 return reported a $29,286,968 CNOL, all

of which was attributable to petitioner. The CNOL was the result of a commodities contract with LTV Steel Company that petitioner claimed was worthless, shares of Olga Coal that petitioner claimed were worthless, and a debt owed to petitioner by Olga Coal that petitioner claimed was a bad debt.

On September 17, 1987, petitioner and AMC filed two Forms 1139 with respect to their 1986 tax year. On the first Form 1139, petitioner requested an $11,298,371 tentative carryback adjustment attributable to the carryback of petitioner's 1986 CNOL to petitioner's (i.e., the affiliated group's) 1984 and 1985 tax years. Petitioner attached to the application an application for electronic funds transfer and a deposit ticket for a bank account maintained by petitioner. Petitioner also included in the application a copy of an amended consolidated return for 1984 filed by Interlake, which indicated that Interlake was the successor in interest to the affiliated group. On the second Form 1139, petitioner requested a $148,692 tentative carryback adjustment attributable to the carryback of $174,931 of investment tax credits and credits for increasing research activity from petitioner's (i.e., the group's) 1984 year to petitioner's (i.e., the group's) 1981 year. The credits were freed up as a result of the carryback of the CNOL to 1984.

After reviewing petitioner's requests, respondent informed petitioner that it would not process the first Form 1139 because

it did not take into account the tentative refund that had been paid to Interlake with respect to the 1984 tax year. On October 26, 1987, petitioner filed a revised Form 1139 that took into account the earlier tentative refund paid to Interlake. On the revised Form 1139, petitioner requested tentative refund allowances of $3,109,029 and $3,542,388 for 1984 and 1985, respectively.

On November 1, 1987, 45 days after petitioner had filed its original Form 1139 with respondent and less than a week after petitioner filed the revised Form 1139, respondent paid tentative refunds to petitioner of $148,692 for 1981, $3,109,029 for 1984, and $3,524,388 for 1985. Neither Interlake nor any member of its affiliated group received any portion of the tentative refunds paid to petitioner.

Administrative Proceedings

Sometime after the tentative refunds were paid, respondent determined to reverse the tentative refunds made to petitioner and Interlake pending a determination whether petitioner or Interlake continued as the common parent of the affiliated group as a result of the 1986 restructuring and spinoff. Respondent informed petitioner of his determination in a February 1, 1988, letter and requested repayment within 10 days.

Petitioner responded in a February 26, 1988, letter stating that it was entitled to the refunds, and that any issues

regarding the refunds could be handled through regular audit procedures. Petitioner refused to repay the refunds but recited its understanding that collection activities would be stayed pending the resolution of a technical advice request by respondent's revenue agent to the IRS National Office.

On July 31, 1989, respondent issued technical advice memoranda in the form of private letter rulings (PLR), PLR 8946007 to petitioner and PLR 8946006 to Interlake. Both PLR's recite the steps taken in the restructuring of the affiliated group and the spinoff, and state "both [petitioner] and [Interlake] claim to be the continuation of the original group." The PLR's conclude that the affiliated group of which petitioner had been the common parent continued, with petitioner remaining the common parent. The PLR's relied on the general rule of section 1.1502-75(d)(1), Income Tax Regs., which provides that an affiliated group shall be considered as remaining in existence if the common parent remains the common parent of at least one subsidiary, whether or not the subsidiary was a member of the affiliated group in the prior year. Since petitioner was the common parent of an affiliated group that consisted of petitioner and AMC, PLR 8946007 concluded that petitioner and AMC represented the continuation of the affiliated group. PLR 8946006 concluded that Interlake and its subsidiaries composed a new affiliated group. The immediate significance of respondent's

conclusion that petitioner was the continuing common parent of the affiliated group was that Interlake's postspinoff losses were subject to the separate return limitations (SRLY) rules of section 1.1502-21(c), Income Tax Regs., which, among other things, provide limits on net operating loss carrybacks. See Sec. 1.1502-21(c)(2), Income Tax Regs.

Notice of Deficiency and Stipulation of Settled Issues

On March 15, 1994, respondent issued petitioner a notice of deficiency reflecting the positions taken in the PLR's. Respondent determined that petitioner was the continuing common parent of the affiliated group and revised petitioner's income on the basis of a 52-week 1986 tax year rather than a 27-week tax year as reported on petitioner's 1986 return. Respondent disallowed the carrybacks to 1981 and 1984, determining that petitioner did not sustain a CNOL in 1986 as claimed by petitioner in its applications for tentative carryback adjustments. The 1986 CNOL was disallowed in full.

In addition to 1981 and 1984, the notice of deficiency included deficiencies for 1974 through 1978, 1980, and 1983. Respondent disallowed consolidated investment credit carrybacks from 1978 to 1975 and 1974. Respondent disallowed a consolidated investment credit carryback from 1979 to 1976, a consolidated foreign tax credit carryback from 1979 to 1977, a consolidated foreign tax credit carryback from 1980 to 1978, a consolidated

net operating loss carryback from 1983 to 1980, a consolidated investment credit carryover from 1979 to 1980, and consolidated investment, jobs, qualified research, and energy credit carrybacks from 1983 to 1980. For 1981, respondent determined a deficiency resulting from the disallowance of consolidated net operating loss carrybacks from 1982, consolidated qualified research credit carrybacks from 1984, consolidated investment credit carrybacks from 1982 and 1983, and consolidated general business credit carrybacks from 1984. Respondent made several determinations for 1983, including disallowing a claimed section 162 expense, ordinary losses realized on the liquidation and dissolution of Erie Mining Company, a subsidiary, disallowing a consolidated net operating loss carryback from Interlake's 1986 tax year, and disallowing other carrybacks and carryovers. With respect to 1984, respondent disallowed a trade or business expense, charitable contributions, the net operating loss carried back from 1986, and disallowed other credits and carrybacks.

On May 16, 1994, petitioner filed a petition in which it disputed all of respondent's determinations. Paragraph 5v of the petition alleges that respondent "erroneously determined that * * * [petitioner] is the common parent of the affiliated group". Additionally, the petition alleges that the notice of deficiency issued to petitioner was not issued to the appropriate

representative of the affiliated group, depriving the Court of jurisdiction.

Petitioner was represented by John M. Newman, Jr., and Kenneth E. Updegraft, Jr. when it filed the petition.  The signatures of Messrs. Newman and Updegraft appear on the petition.  Messrs. Newman and Updegraft are partners in the same law firm that represented petitioner and Interlake in the preparation of the tax indemnification agreement.

After settlement discussions in which respondent agreed, subject to the execution of a closing agreement, to treat Interlake as the common parent of the affiliated group, respondent issued a duplicate notice of deficiency to Interlake on February 8, 1996.  Interlake filed a petition on May 1, 1996, and the case was assigned docket No. 8258-96.  Interlake was represented by Messrs. Newman and Updegraft when it filed that petition.  The signatures of Messrs. Newman and Updegraft appear on Interlake's petition.

On December 4, 1997, respondent entered into a stipulation of settled issues with petitioner.  Paragraph 1 states that Interlake is the continuing common parent of the affiliated group; paragraphs 2 through 8 provide that petitioner is allowed an investment tax credit carryback from 1982 to 1981 which resulted in an increased deficiency for 1980, deductions for capital loss carrybacks from 1986 to 1984 and 1983, a net

operating loss carryback from Interlake's 1986 year to 1983, a deduction for a net operating loss carryback from petitioner's 1986 year to 1984, general business credit carrybacks from Interlake's 1986 year to 1984 and 1983; a general business carryback from petitioner's 1986 year to 1984, a foreign tax credit carryback from Interlake's 1986 tax year to 1984.

Paragraph 9 provides that all other issues raised by the petition, including the contention in the petition "relating to jurisdiction", are conceded by petitioner.

Paragraph 10 provides that petitioner would be liable for "deficiencies in income tax in the amount of $1,709,109 for the taxable year ended December 27, 1981, and $3,109,029 for the taxable year ended December 30, 1984," if the tentative refunds petitioner received on November 1, 1987, "do not represent a rebate to Interlake."

Petitioner continued to be represented by Messrs. Newman and Updegraft when it entered into the stipulation of settled issues. Mr. Newman's signature appears on the stipulation of settled issues.

On September 28, 1998, petitioner filed a chapter 11 petition with the United States Bankruptcy Court. On January 11, 1999, the proceedings in the Tax Court were stayed pursuant to 11 U.S.C. section 362 (2002).

Interlake v. Commissioner

On March 18, 1999, the Court decided Interlake Corp. v. Commissioner, 112 T.C. 103 (1999), on cross-motions for summary judgment. In the stipulation of facts and stipulation of settled issues in that case, the parties thereto, namely, Interlake and respondent, agreed that Interlake was the common parent of the affiliated group after the restructuring. Respondent also conceded that a refund paid to the "wrong taxpayer, or to an unauthorized recipient of the taxpayer", is a nonrebate refund that may not be taken into account in computing a deficiency. Respondent having made the foregoing concessions, the only issue for decision was whether the tentative refunds paid to petitioner were rebates or nonrebates to Interlake for purposes of computing the affiliated group's deficiencies, if any, for 1981 and 1984 under section 6211. Section 1.1502-6(a), Income Tax Regs., provides that each member of an affiliated group is severally liable for any taxes computed on the basis of a consolidated return. The significance of the rebate/nonrebate distinction is that if the refunds were held to be nonrebate refunds as to Interlake, they could not be taken into account in computing the affiliated group's deficiencies and could not be recovered from Interlake through the deficiency procedures.

The rebate/nonrebate character of the tentative refunds turned on whether petitioner was "authorized" to receive the

tentative refunds on behalf of the Interlake group. In deciding
whether the refunds were rebate or nonrebate, the Court examined
section 1.1502-78(b)(1), Income Tax Regs., which provides:

> Any refund allowable under an application referred to
> in paragraph (a) of this section shall be made directly
> to and in the name of the corporation filing the
> application, except that in all cases where a loss is
> deducted from the consolidated taxable income or a
> credit is allowed in computing the consolidated tax
> liability for a consolidated return year, any refund
> shall be made directly to and in the name of the common
> parent corporation.  The payment of any such refund
> shall discharge any liability of the Government with
> respect to such refund.

The Court determined that, for purposes of section 1.1502-
78(b)(1), Income Tax Regs., "the common parent" is the
corporation that has authority to act as an agent for the
affiliated group.

The Court held that petitioner did not have authority to act
for the group and receive the tentative refunds because, as the
parties--Interlake and respondent--had agreed in their
stipulation of settled issues, petitioner was no longer
affiliated with the group; therefore petitioner's authority to
act for the group ceased when its affiliation was terminated.
The tentative refunds made to petitioner were "nonrebate refunds
with respect to * * * [Interlake] and the group for purposes of
computing the group's deficiencies for 1981 and 1984." Interlake
Corp. v. Commissioner, supra at 115.  Therefore, the Court held

that respondent could not recover the tentative refunds from
Interlake through the deficiency procedures.[1]

Interlake was represented by Messrs. Newman and Updegraft
during all phases of the proceedings before the Court in
Interlake v. Commissioner, supra.

Summary Assessment of the 1985 Tentative Refund

In March 2000, respondent made a "summary assessment" under
section 6213(b)(3) of the $3,542,388 tentative refund respondent
had paid petitioner for 1985. Section 6213(b)(3) provides that

---

[1]On Sept. 26, 2000, respondent issued proposed regulations
that purport to clarify and supplement the rules under sec.
1.1502-77, Income Tax Regs., concerning the agent for an
affiliated group and the designation of a new agent for the
group. The proposed regulations also purport to clarify and
modify the rules concerning the proper party to apply for and
receive a refund attributable to a tentative carryback adjustment
under sec. 1.1502-78, Income Tax Regs. See secs. 1.1502-77 and
1.1502-78, Proposed Income Tax Regs., 65 Fed. Reg. 57755-57763
(Sept. 26, 2000). The preamble to the proposed regulations cites
the difficulties in applying the existing regulations to
situations in which an affiliated group continues following a
restructuring, as highlighted by Interlake Corp. v. Commissioner,
112 T.C. 103 (1999). The proposed amendments to sec. 1.1502-
77(a), Income Tax Regs., provide that the common parent for a
consolidated return year remains the agent for the group for that
year as long the common parent continues to exist. This rule is
to apply even if the common parent, for whatever reason, ceases
to be the common parent. The proposed regulations amend sec.
1.1502-78(a), Income Tax Regs., to provide that the common parent
for the carryback year should file an application under sec. 6411
for a tentative carryback adjustment with respect to a loss or
credit arising in a separate return year that may be carried back
to a consolidated return year, and any tentative refund must be
paid to the corporation that was the common parent for the
carryback year.

the Commissioner may assess amounts refunded under section 6411 that are in excess of the overassessment attributable to the carryback.  The assessment is made as a deficiency as if it were due to a mathematical or clerical error appearing on the return and is not subject to the restrictions of section 6213(b)(2).

The tentative refund paid to petitioner for 1985 was the subject of the bankruptcy proceedings, discussed infra, and is not before the Court.

### The Bankruptcy Proceedings

In the bankruptcy proceedings, respondent filed an unsecured priority claim for taxes, interest, and penalties assessed against petitioner from 1974 through 1980, 1982, 1983, and 1985 through 1991.  With respect to 1981 and 1984, respondent sought to have the bankruptcy court enforce the stipulation of settled issues or, in the alternative, lift the stay with respect to those years so respondent could enforce the stipulation in the Tax Court.  Petitioner objected to respondent's claim with respect to 1981, 1984, and 1985.

Petitioner was represented in the bankruptcy proceedings by, among others, David J. Duez, who is not a partner of Messrs. Newman and Updegraft.  Petitioner argued in the bankruptcy proceeding that the 1981, 1984, and 1985 tentative refunds were nonrebate refunds that do not fall within the definition of a "deficiency" under section 6211.  Accordingly, petitioner argued,

the only way respondent could recover the tentative refunds was to bring an erroneous refund suit under section 7405, for which the period of limitations had expired. Petitioner argued that respondent's failure to bring an erroneous refund suit under section 7405 rendered the tentative refunds uncollectible as a matter of law.

On December 7, 2001, the bankruptcy court issued an opinion and order that granted respondent's request for relief from stay as to 1981 and 1984. The court recited section 362 of the Bankruptcy Code, which provides that the bankruptcy court shall grant relief from the automatic stay only for "cause". In deciding whether cause existed, the bankruptcy court weighed three factors: (1) The prejudice that would result if the stay were lifted; (2) the balance of hardships; and (3) the probable success on the merits.

The bankruptcy court found that petitioner would not be prejudiced because it submitted to the jurisdiction of the Tax Court when it filed the petition and because, but for the bankruptcy petition, a final decision would have already been entered by the Tax Court for 1981 and 1984. The court also held that the balance of hardships weighed in favor of respondent, emphasizing that to deny the relief from the automatic stay would be to deny respondent the benefit of his bargain with petitioner in the stipulation of settled issues. The bankruptcy court

predicted that respondent would prevail in the Tax Court because of the "great importance placed by the Tax Court upon enforcing stipulations entered into in deficiency proceedings." According to the bankruptcy court, allowing the parties to conclude litigation with respect to 1981 and 1984 tax years in the Tax Court would "provide finality as to those years."

With respect to 1985, the bankruptcy court opined that the refund paid in that year was not collectible by summary assessment. The court relied on Interlake Corp. v. Commissioner, 112 T.C. 103 (1999), to hold that the refund paid to petitioner was a nonrebate refund. As a nonrebate refund, there was no "deficiency" within the meaning of section 6213(b)(3). According to the bankruptcy court, because the nonrebate refund did not fall within the section 6213(b) assessment procedures or the section 6212 notice of deficiency procedures, the only recourse for respondent would have been an action to recover an erroneous refund under section 7405, for which the period of limitations had expired.

On January 4, 2002, the United States filed a motion in the bankruptcy court pursuant to Fed. R. Civ. P. 54(b), requesting the bankruptcy court to certify for appeal its decision with respect to the 1985 tentative refund. The motion explains that district courts have jurisdiction to hear appeals from bankruptcy court "final judgments, orders and decrees" pursuant to 28 U.S.C.

section 158.  Under rule 54, a decision that resolves less than all claims presented lacks finality as to each claim unless the court directs the entry of final judgment as to one or more claim.  The motion requests the bankruptcy court to enter a final judgment and certify for appeal its decision sustaining petitioner's objection as to the 1985 tentative refund.  The bankruptcy court has not acted on the motion.

In response to the bankruptcy court's lifting of the stay with respect to 1981 and 1984, respondent, on March 8, 2002, filed a motion for entry of decision by this Court.  Respondent's motion requests the Court to enter a decision in accordance with the stipulation of settled issues in which petitioner agreed to assume liability for the 1981 and 1984 tentative refunds in the event the refunds were nonrebate refunds as to Interlake.

Change of Petitioner's Representatives in This Proceeding

On December 17, 2001, Mr. Duez and his partners, Matthew P. Larvick and Gregory G. Palmer, entered appearances on behalf of petitioner in the case at hand.  On January 16 and February 13, 2002, respectively, Messrs. Newman and Updegraft filed motions for leave to withdraw as counsel for petitioner.  On January 31 and February 13, 2002, the Court granted the motions to withdraw.

Positions of the Parties

Petitioner concedes it was liable to repay respondent the tentative refunds but contends respondent is barred from recovering the tentative refunds through the deficiency procedures.  According to petitioner, both the bankruptcy court and this Court in Interlake Corp. v. Commissioner, supra, held petitioner was not an authorized recipient of the tentative refunds.  Therefore, petitioner argues, the tentative refunds were nonrebate refunds, and respondent's resort to the deficiency procedures to recover them is unavailing.

With respect to the stipulation of settled issues, petitioner argues that an agreement of the parties may not confer jurisdiction on the Court to address and order the payment of items outside the Court's jurisdiction.  Inasmuch as nonrebate refunds do not enter into the computation of a "deficiency", and our jurisdiction is limited to redetermination of deficiencies,[2] petitioner contends we have no jurisdiction to enter a decision on the stipulation of settled issues.

Petitioner also contends respondent is collaterally estopped by the bankruptcy court's opinion with respect to 1985 from arguing that the tentative refunds with respect to 1981 and 1984 were not nonrebate refunds.

---

[2]Of course, our jurisdiction includes other issues not germane to the case at hand.  See, e.g., sec. 6330(d).

Respondent contends respondent paid the tentative refunds to the correct taxpayer pursuant to the procedures under section 6411. Respondent argues that when the tentative refunds were subsequently disallowed, he could have recovered them through the deficiency procedures, by filing a civil action to recover erroneous refunds under section 7405, or by summarily assessing the deficiencies under section 6213(b)(3).

Respondent argues he is not collaterally estopped from arguing that the 1981 and 1984 refunds are not nonrebate refunds. According to respondent, the issue litigated in the bankruptcy court with respect to 1985 is not identical to the issue in the case at hand. The issue in the bankruptcy court was whether a nonrebate refund was subject to the summary assessment procedures of section 6213(b)(3).

Respondent also contends collateral estoppel does not apply because the bankruptcy court has not yet issued a final appealable order. Respondent contends that final resolution in the bankruptcy proceeding of petitioner's tax liabilities for 1981, 1984, and 1985 depends on this Court's entry of a decision on the stipulation of settled issues.

The issue for decision in the case at hand is whether respondent can use the deficiency procedures of sections 6211-6215 to recover the tentative refunds respondent paid petitioner. Petitioner argues the Court lacks jurisdiction to enter a

decision for respondent on the stipulation of settled issues. According to petitioner, the tentative refunds were "nonrebate" refunds that do not figure in the section 6211(a) definition of "deficiency", which includes only "rebate" refunds. Because the refunds did not create a deficiency, petitioner's argument goes, the Court cannot enter decision on a stipulation of a matter over which the Court lacks jurisdiction. The issue is complicated, so we provide a brief overview before addressing it in detail.

Discussion

### Rebate and Nonrebate Refunds

The Internal Revenue Code recognizes two types of refunds: Rebate and nonrebate. O'Bryant v. United States, 49 F.3d 340, 342 (7th Cir. 1995). Rebate refunds are issued on the basis of a substantive recalculation of a taxpayer's tax liability, e.g., the amount of tax due is less than the tax shown on the return. Sec. 6211(b)(2); O'Bryant v. United States, supra. If the recalculation of tax liability is correct, the taxpayer may, of course, retain the refund. However, sometimes the recalculation of tax liability is incorrect, and the Commissioner must recover the erroneous refund. Rebate refunds issued in error may be recovered through the deficiency procedures of sections 6211-6215 or an action for recovery of an erroneous refund under section 7405.

Nonrebate refunds, on the other hand, are issued to taxpayers because of clerical or computer errors, and they bear no relation to a recalculation of tax liability. See O'Bryant v. United States, supra; Clayton v. Commissioner, T.C. Memo. 1997-327. A hallmark of nonrebate refunds is that, unlike rebate refunds, nonrebate refunds are always erroneous. Examples of nonrebate refunds are refunds issued because the Commissioner credited a taxpayer's payment twice or the Commissioner applied a payment to the wrong tax year. The Commissioner is limited to erroneous refund actions under section 7405 to recover nonrebate refunds. The deficiency procedures are not available to the Commissioner to recover nonrebate refunds because of the definition of "deficiency" in section 6211(a): A "deficiency" is the amount by which the tax actually imposed exceeds--

> (1) the sum of
>
>    (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus
>
>    (B) the amounts previously assessed (or collected without assessment) as a deficiency, over--
>
> (2) the amount of rebates, as defined in subsection (b)(2), made. [Emphasis added.]

In Lesinski v. Commissioner, T.C. Memo. 1997-234, we held we do not have jurisdiction over nonrebate refunds.

Petitioner contends the tentative refunds it received as the result of the tentative carryback adjustments for 1981 and 1984 are nonrebate refunds that respondent cannot recover through the deficiency proceedings. Petitioner argues the nonrebate character of the tentative refunds because, on the basis of Interlake Corp. v. Commissioner, 112 T.C. 103 (1999), and the consolidated return regulation in effect when the tentative refunds were paid in 1987, section 1.1502-78(b)(2), Income Tax Regs., the former common parent of an affiliated group is not authorized to receive the tentative refunds on the group's behalf.

What petitioner is trying to do in the case at hand is litigate the merits of an issue the parties have already settled. Despite petitioner's entry into the stipulation, petitioner apparently views our opinion in Interlake as providing an argument too good to pass up. In any event, petitioner's argument is wrapped in a jurisdictional challenge, so we must consider jurisdiction. After we explain why we have jurisdiction to enter a decision based on the stipulation, we shall explain why the tentative refunds were rebates insofar as petitioner is concerned.

Jurisdiction

All Federal courts are courts of limited jurisdiction. Willy v. Coastal Corp., 503 U.S. 131, 136-137, 117 (1992); Bender v. Williamsport Area School Dist., 475 U.S. 534, 541 (1986). The jurisdiction of this Court may be exercised only pursuant to a specific statutory authorization that encompasses the redetermination of deficiencies pursuant to section 6214(a). Belloff v. Commissioner, 996 F.2d 607, 611 (2d Cir. 1993), affg. T.C. Memo. 1991-350; Pen Coal Corp. v. Commissioner, 107 T.C. 249, 254 (1996).

Petitioner's entry into a stipulation of settled issues agreeing to a liability does not, standing alone, provide a sufficient basis for the Court's jurisdiction. We cannot enter a decision pursuant to a stipulation to a matter over which we have no jurisdiction. See United States v. Orr Constr. Co., 560 F.2d 765, 769 (7th Cir. 1977). Nor can our jurisdiction be enlarged by agreement of the parties. Romann v. Commissioner, 111 T.C 273, 281 (1988); Freedman v. Commissioner, 71 T.C. 564 (1979); see, e.g., Loftus v. Commissioner, 90 T.C. 845, 861 (1988), affd. without published opinion 872 F.2d 1021 (2d Cir. 1989). This is true of Federal courts generally, not just the Tax Court. Romann v. Commissioner, supra (citing Bender v. Williamsport Area School Dist., supra at 541). Before the Court can enter decision on the

stipulation of settled issues, we must determine that we have jurisdiction over the matter to which the parties stipulated.

The Notice of Deficiency

The Court's jurisdiction to redetermine a deficiency depends upon the issuance of a valid notice of deficiency and a timely filed petition. Rule 13(a),(c); Monge v. Commissioner, 93 T.C. 22, 27 (1989); Normac, Inc. v. Commissioner, 90 T.C. 142, 147 (1988). In the usual case, the Court will not look behind the notice of deficiency to examine the evidence used by respondent or the circumstances surrounding the determination.[3] See Petzoldt v. Commissioner, 92 T.C. 661, 687-688 (1989). This is because a trial before the Tax Court is a proceeding de novo; our redetermination of a taxpayer's tax liability must be based on the merits of the case and not on any previous record developed at the administrative level. See Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-328 (1974). Moreover, even where a taxpayer has made a showing that casts doubt on the validity of respondent's determination, the notice is generally not rendered void, and it remains sufficient to vest this Court with jurisdiction. See Suarez v. Commissioner, 58 T.C. 792, 814 (1972). Once vested, our jurisdiction is not affected by subsequent events and remains unimpaired until we decide the

---

[3]An exception to the rule, not here at issue, is when the Commissioner alleges that the taxpayer has received unreported income. See Johnston v. Commissioner, T.C. Memo. 2000-315.

case.  See <u>GAF Corp. v. Commissioner</u>, 114 T.C. 519, 525 (2000);
<u>Duggan v. Commissioner</u>, 21 B.T.A. 740 (1930).

In the case at hand, petitioner contends that the notice of
deficiency is invalid because "respondent cannot recover
nonrebate refunds through the deficiency procedures; that is, by
issuing a notice of deficiency."  Petitioner says the tentative
refunds it received were nonrebate refunds and then leaps to the
conclusion that we have no jurisdiction to enter a decision on
the basis of the stipulation because nonrebate refunds do not
enter the formula for deficiencies, and the stipulation speaks of
a "deficiency".  Petitioner points to our opinion in <u>Interlake
Corp. v. Commissioner</u>, <u>supra</u>, and the bankruptcy court's opinion,
both of which said that petitioner, as the former common parent
of the affiliated group, was an "unauthorized recipient" of the
tentative refunds.  The problem with petitioner's theory is that
it assumes respondent never determined a deficiency with respect
to the tentative refunds.[4]  Petitioner's assumption ignores the
factual and legal circumstances surrounding the identification of
the common parent and the issuance of the notice of deficiency.

<u>Respondent's Determination</u>

Section 6212(a) provides that if the Commissioner
"determines" a deficiency, he is authorized to send notice of the

---

[4]Respondent also determined deficiencies against petitioner
for 1974-78, 1980, and 1983.

deficiency to the taxpayer.  Under section 6213(a), the taxpayer may then file a petition with the Court, within a specified time, for a "redetermination" of the deficiency.  Thus, "it is not the existence of a deficiency but the Commissioner's determination of a deficiency that provides a predicate for Tax Court jurisdiction."  Hannan v. Commissioner, 52 T.C. 787, 791 (1969) (citing H. Milgrim & Bros., Inc. v. Commissioner, 24 B.T.A. 853 (1931); O'Meara v. Commissioner, 11 B.T.A. 101, 109 (1928), reversed on other issues 34 F.2d 390 (10th Cir. 1929)).  "Indeed, were this not true, then the absurd result would be that in every case in which this Court determined that no deficiency existed, our jurisdiction would be lost."  Id.

In the case at hand, when respondent issued the notice of deficiency to petitioner, he made several determinations. Prerequisite to the notice was the determination that petitioner was the continuing common parent of the affiliated group, which, after the restructuring, consisted of petitioner and AMC.

A central feature of the consolidated return regulations is the role of the common parent as the exclusive agent of the group with respect to all procedural matters.[5]  See S. Pac. Co. v. Commissioner, 84 T.C. 395, 401 (1985).  Section 1.1502-77(a),

---

[5]The unique treatment of the common parent is not limited to procedural matters.  For example, the common parent's taxable year determines the taxable year of the other members of the group under sec. 1.1502-76, Income Tax Regs.; the common parent is not subject to the basis adjustment rules under sec. 1.1502-32, Income Tax Regs., and the common parent is not subject to the separate return limitation year rules under sec. 1.1502-1(f)(2)(i), Income Tax Regs.

Income Tax Regs., provides that "the common parent * * * shall be the sole agent for each subsidiary in the group, duly authorized to act in its own name in all matters relating to the tax liability for the consolidated return year."  In S. Pac. Co. v. Commissioner, supra at 401, we held that the regulation contemplates that the common parent's authority to act as the agent for an affiliated group arises on a year-by-year basis. For any year for which a consolidated return is filed, the common parent for that year is the exclusive agent with respect to any procedural matters that may arise in connection with the group's tax liability for that year.  Id.; see also Union Oil Co. v. Commissioner, 101 T.C. 130 (1993).

Because of the importance of the identity of the common parent, the continuation of the common parent is critical to the continuation of the affiliated group.  The rules for determining when an affiliated group continues to exist are set forth in section 1.1502-75(d), Income Tax Regs.  Section 1.1502-75(d)(1), Income Tax Regs., provides the general rule that a group shall continue if the common parent remains as the common parent and at least one subsidiary remains affiliated with it, whether or not the subsidiary was a member of the group in a prior year, and whether or not one or more corporations have ceased to be subsidiaries at any time after the group was formed.

Sections 1.1502-75(d)(2) and (3), Income Tax Regs., provide exceptions to the general rule.  Under section 1.1502-

75(d)(2)(ii), Income Tax Regs., a group continues if its common parent transfers substantially all its assets to a subsidiary after which the common parent goes out of existence and there remain one or more chains of includable corporations with a common parent that was a member of the group prior to the date the former common parent ceased to exist.

The reverse acquisition rules of section 1.1502-75(d)(3), Income Tax Regs., provide that an affiliated group will not terminate where the stock or assets of the common parent are acquired by another corporation in exchange for the stock of that other corporation, provided the shareholders of the acquired common parent, after the acquisition, own more than 50 percent of the value of the acquiring corporation's stock. Sec. 1.1502-75(d)(3)(i), Income Tax Regs. If the acquiring corporation, before the acquisition, is a common parent of an affiliated group, that group is deemed to terminate even though the acquiring corporation/common parent continues to exist for all purposes except those of the consolidated return provisions. Section 1.1502-75(d)(3)(i), Income Tax Regs., further provides that, after the acquisition, the acquiring corporation is to be treated as the common parent of the group that is deemed to survive the reverse acquisition. S. Pac. Co. v. Commissioner, supra at 403.

In the case at hand, the restructuring and spinoff do not fit either exception to the general rule. Section 1.1502-2(d)(2)(ii), Income Tax Regs., requires that the common parent cease to exist following the restructuring and petitioner's existence has, of course, continued. Nor did the restructuring constitute a reverse acquisition within the meaning of section 1.1502-75(d)(3), Income Tax Regs., which contemplates situations in which the acquiring and acquired corporations were not affiliated prior to the restructuring. The restructuring in the case at hand was an intra-group transaction, rather than an inter-group transaction. See Rev. Rul. 85-152, 1985-2 C.B. 261.

Respondent, in the statutory notice to petitioner, recharacterized the restructuring and spinoff and applied the general rule of section 1.1502-75(d)(1), Income Tax Regs., to determine that the affiliated group continued with petitioner as the common parent, with AMC as its only subsidiary. Pursuant to the determination that petitioner was the continuing common parent of the group, respondent determined that petitioner's 1986 tax year was 52 weeks, not 27 weeks as claimed by petitioner. Respondent determined that Interlake was the common parent of a new affiliated group that consisted of all of the former subsidiaries of petitioner, except AMC, and that Interlake and the continuing members of its new affiliated group had 2 short taxable years in 1986. Respondent also determined that the

commodities contract with LTV, the shares in Olga Coal, and the debt owed to petitioner by Olga Coal were not worthless as petitioner claimed on its 1986 return. On the basis of the foregoing determinations, respondent determined that petitioner did not sustain a CNOL in 1986 as claimed on its 1986 return. Accordingly, respondent disallowed the carrybacks to 1981 and 1984 and issued a notice of deficiency to recover the tentative refunds.

Respondent's treatment of petitioner as the continuing common parent of the affiliated group and disallowance of the claimed CNOL were "determinations" under section 6212(a) in the same sense that respondent's disallowance of the various credit carrybacks, trade or business expenses, and charitable contributions for 1974-78, 1980-81, and 1983-84 were determinations. See supra pp. 14-15. Thus, the Court was vested with jurisdiction when petitioner filed the timely petition, and our jurisdiction has not been adversely affected by the subsequent litigation in Interlake Corp. v. Commissioner, 112 T.C. 103 (1999), and the bankruptcy proceeding. Once we have jurisdiction, it remains unimpaired until we decide the controversy. GAF Corp. v. Commissioner, 114 T.C. 519 (2000). We hold we have jurisdiction to enter a decision based on the stipulation of settled issues.

Despite the foregoing, petitioner insists that the bankruptcy court's conclusion that the 1985 tentative refund was a nonrebate refund has somehow stripped the Court of jurisdiction. Ignoring Hannan v. Commissioner, 52 T.C. 787 (1969), petitioner is essentially asserting that we have no jurisdiction because there is no deficiency. According to petitioner, there is no deficiency because the bankruptcy court's opinion that the 1985 tentative refund is a nonrebate refund should be extended to the 1981 and 1984 tentative refunds. Petitioner further contends that, under the collateral estoppel doctrine, respondent is precluded from litigating whether the tentative refunds for 1981 and 1984 are nonrebate refunds.

We disagree with petitioner: we hold that petitioner may not rely on the doctrine of collateral estoppel to preclude respondent from litigating whether the tentative refunds petitioner was paid are nonrebate refunds. Not only have the technical requirements of collateral estoppel not been satisfied, but--even if they had been satisfied--petitioner's change of position would invoke the "injustice" exception to collateral estoppel. Having concluded that petitioner's collateral estoppel argument does not preclude us from considering the merits of petitioner's claim, we also disagree with petitioner that the tentative refunds it applied for and received are nonrebate

refunds.  We shall therefore enter decision in accordance with the stipulation of settled issues that petitioner agreed to.

Collateral Estoppel

Petitioner argues that respondent is collaterally estopped by the bankruptcy court's opinion for the taxable year 1985 from litigating whether the tentative refunds for taxable years 1981 and 1984 were "rebates" within the meaning of section 6211(b).[6] We disagree.  In the discussion of estoppel issues that follows, we will have primary recourse to opinions of the Court of Appeals for the Seventh Circuit, to which an appeal in the case at hand would ordinarily lie.

"Collateral estoppel, also called 'issue preclusion', refers to the simple principle that later courts should honor the first actual decision of a matter that has been actually litigated." Chicago Truck Drivers v. Century Motor Freight, Inc., 125 F.3d 526, 530 (7th Cir. 1997) (citing 18 Wright et al., Fed. Prac. P., sec. 4416, at 136 (1981 & Supp. 1997)).  The doctrine ensures that the determination of an issue by a court of competent jurisdiction will be conclusive in subsequent suits.  Id.

Collateral estoppel applies when (1) the issue sought to be precluded is the same as in the prior action; (2) that issue was actually litigated; (3) the determination of the issue was

_____

[6]Petitioner does not argue the preclusive effect of Interlake Corp. v. Commissioner, 112 T.C. 103 (1999).

essential to the final judgment; (4) the party against whom estoppel is invoked was fully represented in the prior action. La Preferida, Inc. v. Cerveceria Modelo, 914 F.2d 900, 906 (7th Cir. 1990). The application of collateral estoppel in the case at hand is not justified because prerequisites (1), (2), and (3) are not satisfied.

Collateral estoppel does not apply to the case at hand because we are deciding an issue that was not litigated in and decided by the bankruptcy court. According to petitioner, the issue decided by the bankruptcy court was whether tentative refunds paid to petitioner "after it left the group were nonrebate refunds". Petitioner contends that the issue in the case at hand is "precisely identical" to the issue decided by the bankruptcy court and that "the facts relating to [petitioner's] authority to receive the refunds have now been conclusively established." We disagree.

The issue the bankruptcy court was asked to decide was whether the 1981, 1984, and 1985 tentative refunds were collectible. The bankruptcy court found that the 1985 tentative refund was not collectible because, under Interlake Corp. v. Commissioner, supra, it was a nonrebate refund that respondent could recover only in an erroneous refund action under section 7405, for which the period of limitations had expired. The linchpin of the bankruptcy court's nonrebate conclusion was that

petitioner was the former common parent of the prespinoff affiliated group when it was paid the tentative refunds. Under the bankruptcy court's interpretation of Interlake Corp. v. Commissioner, 112 T.C. 103 (1999), a tentative refund paid to the former common parent of an affiliated group is a nonrebate refund as to the former common parent.

The problem with petitioner's theory is that it fails to acknowledge that the bankruptcy court's nonrebate conclusion is premised on respondent's stipulation that Interlake was the common parent of the affiliated group at the time the tentative refunds were paid to petitioner. This is neither a fact nor a legal conclusion we are bound to accept. It is well settled that collateral estoppel does not apply where the issue sought to be precluded was determined in a stipulation. Levinson v. United States, 969 F. 2d 260, 264 (7th Cir. 1992). The rationale behind the rule is that stipulated matters have not been adjudicated on the merits. Id.; see also In re Cassidy, 892 F.2d 637, 640 n.1 (7th Cir. 1990) (citing United States v. Intl. Bldg. Co., 345 U.S. 502, 506 (1953) (observing that judgments based on stipulated facts have no collateral estoppel effect, especially in tax cases, because facts so determined are not actually litigated as the doctrine requires)). In the case at hand, petitioner's status at the time the tentative refunds were paid has not been adjudicated. We therefore disagree with

petitioner's contention that "the facts relating to [petitioner's] authority to receive the refunds have now been conclusively established."

We do not give collateral estoppel effect to the bankruptcy court's opinion because the issue we are being asked to decide is not whether tentative refunds paid to the "former common parent" of an affiliated group are rebate or nonrebate refunds. Instead, the issue we are being asked to decide is whether we have jurisdiction over tentative refunds paid to a corporation when the affiliated group, of which the corporation had been the common parent, underwent a restructuring and the identity of the common parent of the prerestructured group was not determined at the time the tentative refunds were paid. This is not the issue that was litigated in and decided by the bankruptcy court. While we agree with petitioner, as we stated in Lesinski v. Commissioner, T.C. Memo. 1997-234, that the Court does not have jurisdiction over nonrebate refunds, and we also agree that Interlake Corp. v. Commissioner, supra, is precedent for analyzing tentative refunds in the rebate/nonrebate framework, we disagree with petitioner that the bankruptcy court's nonrebate conclusion necessarily forecloses the Court's jurisdiction in the case at hand.

To decide whether we have jurisdiction, we must consider the payment of the tentative refunds to petitioner in light of the

facts as they actually existed when the tentative refunds were paid, rather than how they were assumed to exist by the bankruptcy court.  Only when we consider the facts as they existed at the time of payment can we conclusively and reliably characterize the tentative refunds as either rebate or nonrebate refunds.  For the same reason, we do not believe that Interlake Corp. v. Commissioner, supra, is dispositive of the case at hand.

In Interlake Corp., we held that respondent could not recover from Interlake the tentative refunds paid to petitioner. Respondent conceded that refunds paid to the "wrong taxpayer" or an "unauthorized representative of the taxpayer" were nonrebate refunds and that Interlake was the continuing common parent of the prespinoff affiliated group.  We reasoned that petitioner, as the former common parent of the prespinoff affiliated group as conceded by respondent, was not an "authorized recipient" of the tentative refunds under section 1.1502-78(b), Income Tax Regs. Accordingly, the tentative refunds were nonrebate refunds as to Interlake which could not be included in the computation of a deficiency as to Interlake.  Id. at 115.  Our reasoning was based on two assumptions premised on respondent's concession of the common parent issue:  (1) That Interlake was the continuing common parent of the prespinoff affiliated group (and petitioner was the common parent of a new postsplit affiliated group), and (2) that Interlake's status as the common parent of the

prespinoff group was settled at the time the tentative refunds were issued.  Having assumed that petitioner was the former common parent of the group, we held it no longer had "authority to act for the group" and receive the tentative refunds on the group's behalf.  Id.  When respondent paid the tentative refunds to the former common parent, he paid the wrong taxpayer.  Id.

In the case at hand, respondent is not attempting to recover the tentative refunds from a taxpayer who never received them, actually or constructively.  We are therefore not willing to make the same assumptions we made in Interlake Corp. v. Commissioner, supra.  Rather than assume the identity of the group that was the continuation of the prespinoff group was clear when the tentative refunds were paid because of respondent's concession 10 years later, we examine the issue in light of the facts as they actually existed when the tentative refunds were paid. Consistent with this premise, we accordingly decide whether the tentative refunds issued to petitioner were rebates when it was unclear to respondent whether petitioner or Interlake was the continuing common parent of the prespinoff affiliated group. We are thus presented with an issue different from the one that was opined on by the bankruptcy court.

The bankruptcy court's treatment of the tentative refunds paid for 1981 and 1984 confirms our conclusion that the bankruptcy court did not decide the issue we are being asked to

decide in the case at hand.  Collateral estoppel applies only to issues actually decided in a prior proceeding.  Petitioner asked the bankruptcy court to find that the tentative refunds for 1981, 1984, and 1985 were uncollectible nonrebate refunds.  The bankruptcy court opined the tentative refund for 1985 was uncollectible but specifically excluded the 1981 and 1984 tentative refunds from its conclusion, leaving the final determination with respect to the 1981 and 1984 tentative refunds to this Court.  According to the bankruptcy court, litigation in this Court with respect to 1981 and 1984 would "provide finality as to those years".  The bankruptcy court clearly assumed the Court has jurisdiction to enter a decision based on the stipulation of settled issues and did not intend that its opinion on the 1985 tentative refund would be accorded preclusive effect as to the 1981 and 1984 tentative refunds, or that it would be turned into an argument about jurisdiction that, according to petitioner, respondent is collaterally estopped from challenging.

The application of collateral estoppel to the case at hand is also inappropriate because the bankruptcy court's decision lacks finality.  "To be 'final' for purposes of collateral estoppel the decision need only be immune, as a practical matter, to reversal or amendment."  Miller Brewing Co. v. Jos. Schlitz Brewing Co., 605 F.2d 990, 996 (7th. Cir. 1979).  "Whether a judgment * * * [is] 'final' in the sense of precluding further

litigation of the same issue, turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." Id. (quoting Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2d Cir. 1961)).

The bankruptcy court's opinion is not final because it is avowedly tentative and interlocutory. The bankruptcy court's opinion is avowedly tentative because it refused to rule on the 1981 and 1984 tentative refunds, allowing the parties to conclude litigation with respect to 1981 and 1984 in this Court to "provide finality as to those years". In addition, the bankruptcy court's opinion is interlocutory, not final, because it has not issued an appealable order. On January 4, 2002, the United States filed a motion in the bankruptcy court to certify its opinion for appeal under Fed. R. Civ. P. 54(b). The bankruptcy court has yet to act on the motion. We recognize that finality for collateral estoppel purposes does not necessarily require a final decision. See Coleman v. Commissioner 16 F.3d 821 (7th Cir. 1994), affg. T.C. Memo. 1990-99. However, we do not believe the bankruptcy court's opinion is sufficiently final because respondent has not even had the opportunity to appeal the decision with respect to 1985; the bankruptcy court has not acted on respondent's rule 54(b) motion. The lack of an opportunity for review and the avowedly tentative nature of the bankruptcy

court's opinion, two of the three factors articulated in <u>Lummus</u> in determining finality, are missing.  We conclude the bankruptcy court's opinion is not sufficiently  final to be accorded preclusive effect.

### The "Injustice Exception" to Collateral Estoppel

Even if the technical requirements of collateral estoppel had been satisfied in the case at hand--they were not--we would not give preclusive effect to the bankruptcy court's opinion because of concerns for justice and fair dealing.  In the case at hand, to give credence to petitioner's contentions would implicate the "manifest injustice" exception to collateral estoppel.

We acknowledge that the exception to collateral estoppel for "manifest injustice" is applied by courts with "great caution" to ensure that collateral estoppel's goals of assuring finality and conserving judicial resources are not frustrated.  18 Wright et al., Fed. Practice and Procedure, sec. 4426; see also <u>RecoverEdge v. Pentecost</u>, 44 F.3d 1284, 1290-1291 n. 12 (5th Cir. 1995).  Nevertheless, this is an appropriate case for the "injustice" exception because the issue of the Court's jurisdiction has not been decided, despite petitioner's assertions to the contrary.

Collateral estoppel should not be applied where to do so would work a "manifest injustice".  See Grantham v. McGraw-Edison Co., 444 F.2d 210, 217 (7th Cir. 1971); see also 18 Wright et al., Fed. Prac. P., secs. 4424, 4426 (2002).  The determination of "'whether or not application of collateral estoppel is fair depends upon a case by case analysis,' and * * * courts should be sensitive to the 'practical realities which surround the parties'."  Chicago Truck Drivers v. Century Motor Freight, Inc., 125 F.3d at 531 (quoting Butler v. Stover Bros. Trucking Co. 546 F.2d 544, 551 (7th Cir. 1977)).  A situation in which the application of collateral estoppel produces an unjust result is when the party sought to be precluded did not have an adequate incentive to obtain a full and fair adjudication in the initial action.  See Ferrell v. Pierce, 785 F.2d 1372, 1384-1385 (7th Cir. 1985); see also Restatement, Judgments 2d, sec. 28(5) (subsection (c)) (1980).

In Ferrell v. Pierce, supra, a District Court in a class action interpreted a decree controlling HUD mortgage default relief practices to require the use of a particular rule when calculating the date of default in all pending and future cases; no appeal was taken.  In a subsequent contempt proceeding, the same issue arose with respect to retroactive rather than future application of the same rule.  The Court of Appeals for the Seventh Circuit ruled that issue preclusion did not foreclose

reconsideration of the earlier rulings.  Id. at 1385.  The court found that the stakes were much higher with respect to retroactive relief and that in the prior cases, HUD did not have much incentive to appeal the District Court determinations.  Id. The significance of the earlier determinations was not sufficiently foreseeable to justify the application of collateral estoppel.  Id.  The court concluded that it would have been inequitable to bar HUD from litigating the issue.  Id.

Considering the practical realities of the case at hand, application of collateral estoppel would produce an unjust result because it would enable petitioner to employ its change of position to prevent respondent from ever litigating the Court's jurisdiction.  In paragraph 9 of the stipulation of settled issues, petitioner expressly conceded the jurisdictional issue it now raises; until this proceeding petitioner never indicated that it was changing its mind.  Respondent clearly did not have the opportunity or the inclination to litigate this Court's jurisdiction in the bankruptcy court.  Based on the stipulation, respondent reasonably believed any challenge to the Court's jurisdiction was settled and had no reason to foresee petitioner's change of position and raise the issue in the bankruptcy court.  Yet petitioner now contends respondent is collaterally estopped from litigating the nonrebate issue, the centerpiece of petitioner's jurisdictional argument.  Since the

nonrebate issue is off limits under petitioner's theory, respondent and the Court would be effectively precluded from ever considering the Court's own jurisdiction.

Precluding any consideration of the Court's jurisdiction would produce an unjust result. Even though petitioner represented in the stipulation of settled issues that it would not raise the jurisdictional issue, petitioner's change of position is not necessarily the source of the injustice. The source of the injustice is petitioner's attempt to use the opinion of the bankruptcy court, which quite clearly was never presented with the issue of how its nonrebate finding might affect this Court's jurisdiction, to prevent any adjudication on the merits of petitioner's jurisdictional argument. Even if all the requirements for collateral estoppel were satisfied in the case at hand, it would not be in the interests of justice to apply the doctrine because respondent did not have a full and fair opportunity to litigate the issue in the bankruptcy court.

We conclude that petitioner may not use the doctrine of collateral estoppel to prevent the Court from considering whether the 1981 and 1984 tentative refunds paid to petitioner were nonrebate refunds.

Tentative Refunds as Rebate Refunds

Petitioner contends the tentative carryback adjustments it received from respondent are nonrebate refunds because, as the

former common parent of the affiliated group, it was an "unauthorized recipient" of the tentative refunds.  We recall that nonrebate refunds are paid to taxpayers because of clerical or computer errors by the Commissioner and are unrelated to the recalculation of tax liability, whereas rebate refunds are paid because of a recalculation of tax.  See O'Bryant v. United States, 49 F.3d at 342; Clayton v. Commissioner, T.C. Memo. 1997-327.  To the extent that tentative carryback adjustments are even susceptible to a rebate/nonrebate analysis, they are the essence of rebate refunds; they are paid because the taxpayer's substantive recalculation of an earlier year's tax liability when a later year's tax attribute is carried back.  As the following discussion demonstrates, respondent paid the tentative refunds to petitioner on the basis of petitioner's recalculation of the group's 1981 and 1984 tax years, and not because of any clerical or computer error.

Under section 6411(a), a taxpayer who incurs an NOL may apply for a tentative refund based on a tentative carryback adjustment of the taxes for the taxable years prior to the NOL year that are affected by the carryback of the NOL.  The application must contain specific information and be filed within 12 months from the end of the year in which the NOL was sustained.  Id.  Although obtaining a cash infusion by way of a refund is the objective, an application for a tentative carryback

adjustment does not constitute a claim for a refund; if the tentative refund is disallowed, no action to obtain it may be commenced in any court. Secs. 1.6411-1(b)(2), 1.6411-3(c), Income Tax Regs. Following denial of a tentative carryback adjustment, the taxpayer's only recourse is to file a formal claim for refund, sec. 1.6411-3(c), Income Tax Regs., with the delay attending its likely denial by the Commissioner, which can be vindicated only through a refund suit in the United States Court of Federal Claims or a Federal District Court.

Upon receiving an application for a tentative refund, the Commissioner is required within a 90-day period to undertake a "limited examination" of the application to discover omissions and errors of computation, determine the amount of the decrease in the tax occasioned by the carryback, and make the appropriate credit or refund. See sec. 6411(b); sec. 1.6411-3, Income Tax Regs.

The tentative refund provisions were designed to give financially ailing taxpayers a quick infusion of cash without subjecting the claim to the delay attending a formal examination, see Pesch v. Commissioner, 78 T.C. 100, 115 (1982), as well as to provide relief from the strict application of the annual accounting period. Because of the limited time within which respondent must act, if he is to act at all, on an application for tentative carryback adjustment, the formal examination of

whether the taxpayer is entitled to retain the tentative refund necessarily happens after the refund payment has been made.  See sec. 6501(k) (extending the period of limitations for the carryback year where amounts have been refunded under section 6411).

When it turns out (or respondent determines after a more leisurely examination) that a taxpayer is not entitled to retain a tentative refund, respondent has three remedies to recover the tentative refund.  "Any one or more of the three available methods may be used to recover any amount which was improperly applied, credited, or refunded in respect of an application for a tentative carryback adjustment."  Sec. 301.6213-1(b)(2)(ii), Proced. & Admin. Regs.; see Baldwin v. Commissioner, 97 T.C. 704, 710 (1991);  Pesch v. Commissioner, supra at 117; Midland Mortgage Co. v. Commissioner, 73 T.C. 902, 905-906 (1980); Fine v. Commissioner, 70 T.C. 684, 687-688 (1978).  These three methods are:  (1) Assessment of the deficiency attributable to a tentative carryback adjustment as if due to a mathematical error under section 6213(b)(1); (2) civil action under section 7405; or (3) notice of deficiency under section 6212.  See Baldwin v. Commissioner, supra at 710.  The selection of the particular remedy is within respondent's discretion.  Pesch v. Commissioner, supra at 118.

In the case at hand, petitioner contends the deficiency procedures are not available to respondent to recover the tentative refunds on the ground that they are nonrebate refunds because petitioner, as the former common parent, was an "unauthorized recipient".

Contrary to petitioner's suggestion otherwise, respondent was not sure who the "authorized representative" of the affiliated group was when he paid the tentative refunds and was not required to undertake to decide that question prior to paying the tentative refunds. We therefore disagree that the tentative refunds were paid to petitioner because of any mistake by respondent that would give rise to petitioner's receipt of a nonrebate refund.

When the Commissioner receives an application for tentative carryback adjustment, he is required within a 90-day period to undertake a "limited examination" of the application. Sec. 6411(b). During the limited examination, the Commissioner is expected to uncover ministerial and computational errors and omissions. The limited examination is not designed to provide a thorough review of all of the facts and statutory and regulatory provisions pertaining to the taxpayer's right to the refund. Polachek v. Commissioner, 22 T.C. 858, 863-865 (1954). The review of the facts and relevant statutory and regulatory

provisions happens after the tentative refund has been paid, when the Commissioner conducts a formal examination.

Section 1.1502-78(b)(1), Income Tax Regs., provides that if a member of an affiliated group applies for a tentative refund, the refund "shall be made directly to and in the name of the common parent corporation". If the identity of the common parent had been settled at the time the tentative refunds were issued, we might agree with petitioner that a mistaken payment of the tentative refunds to any other taxpayer would be a nonrebate refund, not recoverable through the deficiency procedures. See Interlake Corp. v. Commissioner, 112 T.C. at 114-115. Those are not the facts of this case.

When respondent paid petitioner the tentative refunds, respondent was not sure which group was the continuation of the prespinoff affiliated group. That affiliated group had been restructured so that petitioner, the common parent, became a subsidiary and was spun off less than one month thereafter. After the spinoff, both petitioner and Interlake were parents of two different affiliated groups that both originated from the prespinoff group. Respondent received applications for tentative carryback adjustments from both petitioner and Interlake relating to the 1986 tax year. Respondent paid both petitioner and Interlake tentative refunds on the basis of the applications they each submitted. Respondent was not required, during the 90-day

"limited examination" period, to try to determine which group continued as the prespinoff affiliated group. That determination required an application of the relevant regulations to the facts of the restructuring and was appropriately left for the regular examination. Respondent followed the requirements of the statute and paid the tentative refunds to petitioner and Interlake well within the 90-day period provided for in section 6411(b).

Respondent examined petitioner's 1986 tax year after he paid the tentative refunds and determined that petitioner did not sustain the CNOL claimed on its 1986 return, and that petitioner was the continuing common parent of the prespinoff affiliated group. Respondent issued the notice of deficiency to petitioner on the basis of the foregoing determinations. See sec. 1.1502-77(a), Income Tax Regs. (providing that the notice of deficiency shall be mailed only to the common parent).

We cannot identify any error, clerical or otherwise, made by respondent in paying the tentative refunds to petitioner and then attempting to recover them through a notice of deficiency when he determined petitioner was not entitled to them. We have consistently upheld the Commissioner's right to proceed in this manner.

In Pesch v. Commissioner, 78 T.C. 100 (1982), the taxpayers contended that a tentative refund issued more than 90 days after the application could not be recovered through the deficiency

procedures and that the Commissioner's exclusive remedy was an erroneous refund action under section 7405, for which the period of limitation had expired.  We held that a tentative refund paid pursuant to section 6411 is a "rebate" because it is made on the ground that the tax imposed is less than the amount of tax shown on the taxpayer's return.  Pesch v. Commissioner, supra at 111. We rejected the taxpayer's contention that the Commissioner's remedies to recover tentative refunds issued after the 90-day period provided in section 6411 are somehow limited.  We noted that section 6411 does not penalize the Commissioner for failure to act on an application within 90 days and held that we would not supply a penalty in the form of a bar against the Commissioner determining a deficiency.  Pesch v. Commissioner, supra at 115.  In so holding, we stressed the tentative nature of refunds paid pursuant to section 6411 and concluded that any action the Commissioner may take is not final.  Accordingly, we concluded that when the Commissioner allows and pays a tentative carryback adjustment that he later determines was made in error, the selection of the remedy to correct the error is within the Commissioner's discretion.  Id. at 118.

In Baldwin v. Commissioner, 97 T.C. 704 (1991), the taxpayers claimed an NOL for 1987 that they carried back to 1985 on an application for tentative carryback adjustment.  The taxpayers had not paid any tax in 1985 and requested that the

refund be applied against the unpaid tax liability.  After paying the tentative refund, the Commissioner determined that the taxpayers did not sustain the NOL and issued a notice of deficiency for 1985.  The taxpayers filed a petition and then filed a motion to dismiss for lack of jurisdiction because there was no "deficiency".  The taxpayers argued that a credit resulting from a tentative carryback adjustment is not a rebate because it did not result from the return showing more tax than was imposed.  Baldwin v. Commissioner, supra at 708.  We rejected petitioner's argument and held that the credit was made against the taxpayer's 1985 tax liability because the amount of tax imposed after the NOL was carried back was less than the amount shown on the return.  We therefore concluded that the credit was a rebate under section 6211(b)(2).

In Neri v. Commissioner, 54 T.C. 767 (1970), the Commissioner issued tentative refunds on the basis of taxpayers' applications for tentative carryback adjustments carrying back NOLs sustained in 1963, 1964, and 1965 to 1959, 1961, and 1962, respectively.  The Commissioner subsequently issued a notice of deficiency for 1959, 1961, and 1962 because the taxpayers, as shareholders of an S corporation, were required first to apply the NOLs to their gross income in each of the taxable years in which the NOLs were sustained.  Id. at 769.  We rejected the taxpayers' contention that the summary assessment procedures were

the exclusive means by which respondent could recover tentative refunds issued in error. We cited the committee report accompanying the predecessor to section 6411, which stated that in recovering erroneous tentative refunds, "the Commissioner will usually proceed by way of a deficiency notice in the ordinary manner, and the taxpayer may litigate any disputed issues before the Tax Court." Id. at 771 (citing H. Rept. 849, 79th Cong., 1st Sess. (1945), 1945 C.B. at 583).

In Collegiate Cap & Gown v. Commissioner, 59 T.C. 449, 455 (1972), we found that the purposes of section 6411 are better served when the remedies available to the Commissioner to recover tentative refunds issued in error are construed broadly. We observed that if the Commissioner were unable to use the deficiency procedure to recover refunds issued pursuant to section 6411, there would be a "real danger that he would feel compelled to act more cautiously in allowing tentative carryback adjustments." Id. When an application is denied, the taxpayer's only recourse is to file the more time-consuming ordinary claim for refund, denying a financially troubled taxpayer the quick infusion of cash contemplated by section 6411.

The foregoing cases confirm our conclusion that respondent properly resorted to the deficiency procedures in the case at hand. We shall not allow petitioner to penalize respondent by erecting a bar against the determination of a deficiency; we

cannot identify any error committed by respondent in paying the tentative carryback adjustments and later determining deficiencies with respect to them, much less a clerical or computer error. See Pesch v. Commissioner, 78 T.C. at 115.

Petitioner repeats ad nauseam that it was an unauthorized recipient of the tentative refunds because it was the former common parent of the affiliated group. However, the record indicates respondent treated petitioner as the common parent of the affiliated group for 10 years following the payment of the tentative refunds. In fact, respondent's current concession on this score in the stipulations of settled issues he signed with Interlake and petitioner is a stipulation of a legal conclusion that, had we been called upon to consider it, we would ignore. See Rose Ann Coates Trust v. Commissioner, 55 T.C. 501, 511 (1970) (stipulation of legal conclusions may be disregarded), affd. 480 F.2d 468 (9th Cir. 1973). Section 1.1502-75(d)(1), Income Tax Regs., provides the general rule that a group shall continue if the common parent remains as the common parent and at least one subsidiary remains affiliated with it, whether or not the subsidiary was a member of the group in a prior year, and whether or not one or more corporations have ceased to be subsidiaries at any time after the group was formed. Since petitioner was the common parent of an affiliated group that consisted of petitioner and AMC, petitioner's group represents

the continuation of the prespinoff affiliated group; Interlake, as a result of the restructuring and spinoff, became the common parent of a new affiliated group.

Even if respondent's concession that Interlake was the common parent were correct as a matter of law, which we doubt, the treatment of petitioner as the common parent was based on the regulations as they applied to the facts of the restructuring. See supra pp. 33-37. In other words, any error of respondent was an error in his interpretation of the consolidated return regulations, not an error in performing his clerical responsibilities that would give rise to nonrebate refunds.

Rebate v. Nonrebate Refunds

Other cases applying the rebate/nonrebate distinction provide further support for the result we arrive at. The cases addressing the rebate/nonrebate distinction illustrate that, even though respondent's payment of the tentative refunds may have been erroneous, it was not the sort of error that leads to a nonrebate characterization. As we have said, rebate refunds are refunds paid because of a substantive recalculation by the taxpayer or Commissioner that the tax due is less than the amount shown on the return. O'Bryant v. United States, 49 F.3d at 342. Nonrebate refunds, on the other hand, are issued because of mistakes, typically clerical or computer error, that are invariably made by the Commissioner. Id.

In O'Bryant v. United States, supra, the Commissioner determined that the taxpayers had not properly computed their tax for 1984. After some discussion, the parties agreed on an additional amount due, and the Commissioner made an assessment of that amount. In August 1987, the taxpayers paid $27,999 in full payment of all amounts due for 1984. The taxpayers did not request a refund, but they received a check from respondent dated January 1, 1988, for $28,925. Id. at 342. Notations on the check indicated that it was a refund of the amount paid in August 1987, plus interest. The refund was caused by the Commissioner's crediting the August 1987 payment twice to the taxpayer's 1984 account. O'Bryant v. United States, 839 F. Supp. 1321, 1323 (C.D. Ill. 1993). The Commissioner attempted to collect the $28,925 through the summary collection procedures under section 6502(a)(1), which requires an assessment of liability.

The Court of Appeals for the Seventh Circuit found that the refund was a nonrebate refund because it was paid by reason of an accounting error by the IRS. O'Bryant v. United States, 49 F.3d at 342. The court emphasized the fundamental difference in character between rebate and nonrebate refunds: Nonrebate refunds are issued by the Commissioner by accident, while rebate refunds are issued because of the taxpayer's tax liability. Id. at 346; see also Clark v. United States, 63 F.3d 83 (1st Cir. 1995). Accordingly, the Commissioner was limited to an erroneous

refund action under section 7405. The Court of Appeals agreed with cases holding that the payment of tax extinguishes the assessment and that the assessment is not somehow revived when the Commissioner mistakenly issues a refund. In Clayton v. Commissioner, T.C. Memo. 1997-327, the Court observed that whether the refund is a rebate or nonrebate refund depends on what it represents: If the refund reflects a recalculation of the taxpayers' tax liability, it is a rebate refund; if the refund is unrelated to a recalculation of tax liability, it is a nonrebate refund.

In the case at hand, the tentative refunds were not issued by accident, see O'Bryant v. United States, supra at 342, or because of an error unrelated to the recalculation of tax liability, see Clayton v. Commissioner, supra. The tentative refunds were issued on the basis of petitioner's recalculation of the tax owed by the group for 1981 and 1984. In 1987, petitioner decided that it had sustained a $29,286,968 CNOL, which could be carried back to, and deducted from, the affiliated group's 1984 tax year income, which in turn freed credits claimed in 1984 to be carried back to 1981. See sec. 172; sec. 1.1502-21, Income Tax Regs. To give effect to its calculations, petitioner applied for and received a tentative carryback and refund adjustment pursuant to section 6411. Thus, when petitioner filed the application for tentative carryback adjustment, it substantively

recomputed the group's tax liability for 1981 and 1984. Had petitioner's recomputation of tax liability been correct, i.e., had it actually sustained the CNOL claimed on its 1986 return and properly carried it back to 1984 and 1981, it would have been entitled to retain the tentative refunds.[7]

Petitioner contends that, even though it recomputed the group's tax liability on the applications for tentative carryback adjustments, the tentative refunds were paid to the "wrong taxpayer" by accident and that any refund paid to the wrong taxpayer is a nonrebate refund. Petitioner's conclusory argument is premised on the finding that, at the time the tentative refunds were paid, it was settled that Interlake was the continuing common parent of the prespinoff group and that respondent paid petitioner by mistake.

---

[7]The tax indemnification agreement would not alter this result. Par. 6(a) provides that if petitioner realizes a net operating loss or credits that may be carried back to taxable years ending before Dec. 31, 1986, Interlake, to the extent it receives any refund from respondent, shall within 10 days of receiving the refund pay petitioner the amount of the refund, plus interest.

The foregoing language of the tax indemnification agreement makes it clear that, as a matter of contract law, petitioner was entitled to the tentative refund that it applied for and that was paid to it. Even if respondent never took the position that petitioner was the common parent and issued the refund to Interlake, Interlake would have been obligated to pay the refund over to petitioner within 10 days, in which case petitioner would have occupied the exact same economic position it is in today.

We reject petitioner's argument because it is based on false premises. As previously discussed, respondent paid petitioner the tentative refunds pursuant to petitioner's application for tentative carryback adjustment at a time when respondent had not finally determined which affiliated group was the continuation of the prespinoff affiliated group. Respondent paid the tentative refunds by depositing the funds in an account maintained by petitioner pursuant to the attached application for electronic funds transfer, and within the time prescribed by section 6411(b). Respondent later determined that petitioner did not sustain the CNOL it claimed on its 1986 return and that petitioner was the continuing common parent of the prespinoff affiliated group. Even if the latter determination had been erroneous, which we doubt, it was an erroneous application of the relevant regulations to the restructuring and spinoff, not a clerical or computer error.

The tentative refunds paid to petitioner were rebate refunds to petitioner because they arose from and were attributable to petitioner's recalculation of the group's 1981 and 1984 tax liabilities. Respondent's payment of the tentative refunds was consistent with the requirements of section 6411, and his later determination of a deficiency was consistent with section 6213.

Conclusion

Petitioner applied for tentative refunds based on CNOLs it claimed for 1986. Respondent followed the letter of section 6411 and paid the tentative refunds exactly as petitioner requested within 90 days of receiving the applications for tentative carryback adjustments. Given the complexity of the restructuring and spinoff, followed by the two sets of claims for tentative refunds filed by two different taxpayers seeking to carry losses back to the same tax years of the same affiliated group, respondent might well have properly denied petitioner's application outright. Instead, respondent embraced the spirit of section 6411 and provided petitioner with the quick infusion of cash petitioner requested. After respondent determined that petitioner was not entitled to retain the tentative refunds, petitioner agreed to repay the tentative refunds to respondent, depending on the outcome of Interlake Corp. v. Commissioner, 112 T.C. 103 (1999). But before the Court issued an opinion in Interlake Corp. that Interlake was not required to repay them, petitioner filed a petition in bankruptcy, preventing this Court from entering a decision on the stipulation of settled issues. Petitioner concocted a litigation strategy to avoid repaying the tentative refunds it admitted it was not entitled to retain and had agreed to repay. Petitioner went so far as to retain new counsel to make the argument its old counsel had made in

Interlake Corp. v. Commissioner, supra, and which petitioner through its old counsel had waived in entering into the stipulation of settled issues that respondent asks us to enforce by entering a decision thereon.  Petitioner's strategy appeared to succeed when the bankruptcy court opined that the 1985 tentative refund was uncollectible by summary assessment because it was a nonrebate refund.  Petitioner then tried to get even more mileage out of its nonrebate argument with respect to the 1981 and 1984 tentative refunds in this Court.  However, petitioner had to phrase its argument as a jurisdictional challenge, because it had agreed in the stipulation of settled issues to repay the tentative refunds.  We have rejected that challenge and shall enforce the stipulation of settled issues in accordance with its terms.

In light of the foregoing,

Respondent's motion for entry of decision will be granted, and decision will be entered in accordance with the stipulation of settled issues.